[No. F041778. Fifth Dist. Aug. 13, 2004.]

CALIFORNIA-NEVADA ANNUAL CONFERENCE OF THE UNITED
METHODIST CHURCH et al., Plaintiffs and Respondents, v.
ST. LUKE'S UNITED METHODIST CHURCH et al., Defendants and
Appellants.

**COUNSEL**

Doyle, Penner, Bradley & Watson, Peter Sean Bradley and Randall M. Penner for Defendants and Appellants.

Lewis, Brisbois, Bisgaard & Smith, Robert M. Shannon and Claudia J. Robinson for Plaintiffs and Respondents.

## OPINION

**ARDAIZ, P. J.**—This case involves the issue of who controls a local church's property when the local church (here, appellant St. Luke's United Methodist Church) ends its affiliation with a national or worldwide religious denomination (here, the United Methodist Church). After a nonjury trial, the trial court ruled that the local church held the church property in trust not only for the use and benefit of the local church, but also for the use and benefit of the United Methodist Church. The court also ruled that the local church could not revoke that trust. The trial court's ruling was based largely on its understanding of the meaning of subdivisions (c) and (d) of Corporations Code section 9142. On this appeal, the local church contends that (1) the court erred in concluding that a trust existed in favor of the United Methodist Church, and (2) even if such a trust existed, the local church could and did revoke that trust. As we shall explain, we agree that the evidence presented at trial supports the trial court's conclusion that a trust in favor of both churches was created. But we disagree with the trial court's conclusion that St. Luke's could not revoke the trust in favor of the United Methodist Church. We agree with St. Luke's contention that it could and in fact did revoke the trust which had existed in favor of the United Methodist Church.

█ We publish because Corporations Code section 9142, subdivisions (c) and (d) do not appear to have been analyzed in any detail in any other published cases, and because the meaning of these subdivisions may well be of particular importance to churches which now are, or in the future will be, experiencing difficult doctrinal disputes among their members. As we shall explain in part II of this opinion, we hold that (1) subdivision (c)(2) of Corporations Code section 9142 does not authorize a general church to create a trust interest for itself in property owned by a local church simply by issuing a rule declaring that such a trust exists, and (2) a local church's creation of a trust interest in favor of the general church, including a trust interest created by the local church's agreement to a general church's rule calling for the local church to hold property in trust for the general church, may be revoked by the local church unless the local church has expressly declared that trust to be irrevocable.

## FACTS

### A. *Events Prior to Trial*

Although the trial of this matter spanned 10 days, the evidence presented at trial was essentially undisputed. In 1948 St. Luke's United Methodist Church

(then called St. Luke's Methodist Church) was incorporated under California's General Non-Profit Corporation Law. Its articles of incorporation describe its purposes as follows:

"(1) To establish and maintain a church in the County of Fresno, State of California, as a part of and/affiliated with the Methodist Denomination, and in connection therewith to establish and maintain suitable and customary public religious worship, study and training, according to the articles, rules, usage and discipline of the Methodist Denomination;

"(2) To acquire, manage and hold in trust for the benefit of said St. Luke's Methodist Church, property of every kind and nature, both real and personal; to receive bequests, to lease, mortgage, sell and convey any property belonging to said corporation, and to do all things necessary or convenient to carry out the purpose of said corporation as herein set forth."

What was then known as The Methodist Church united with the Evangelical United Brethren Church in 1968 to form the United Methodist Church. In 1973 St. Luke's Methodist Church amended its articles of incorporation to change its name to St. Luke's United Methodist Church of Fresno. The "Book of Discipline" (sometimes called simply "the Discipline") is "the instrument setting forth the laws, plan, polity, and process by which United Methodists govern themselves . . . ." The basic unit of the Book of Discipline is the "paragraph" (as opposed to a page, chapter, or section). The organizational structure of the United Methodist Church includes what are called a General Conference, jurisdictional conferences, central conferences, annual conferences, and charge conferences. We need not describe these in detail here, except to note that "annual conferences" are described in the Book of Discipline as "the fundamental bodies of the Church" and have certain supervisory responsibilities over the local churches. Paragraph 118 of the Book of Discipline states in part: " 'The United Methodist Church' as a denominational whole is not an entity, nor does it possess legal capacities and attributes. It does not and cannot hold title to property, nor does it have any officer, agent, employee, office, or location. Conferences, councils, boards, agencies, local churches, and other units bearing the name 'United Methodist' are, for the most part, legal entities capable of suing and being sued and possessed of legal capacities."

Paragraph 2501 of the Discipline provides in part that "titles to all properties held . . . by a local church . . . shall be held in trust for the United Methodist Church and subject to the provisions of its *Discipline*." Paragraph

2503 sets forth specific trust language to be used in "instruments of conveyance by which premises are held or hereafter acquired for use as a place of divine worship for members of The United Methodist Church or for other church activities . . . ." Subparagraph 6 of paragraph 2503 states in part that "the absence of a trust clause . . . in deeds and conveyances previously executed shall in no way exclude a local church or church agency from or relieve it of its connectional responsibilities to the United Methodist Church."

Over the years, St. Luke's acquired title to nine parcels of property: three in 1949, one in 1951, one in 1954, one in 1955, two in 1997, and one in 1998. Five of the nine grant deeds contained trust clauses in favor of the United Methodist Church. Four of the deeds did not. A standardized form on which the St. Luke's board of trustees submitted annual reports to a higher church authority (the charge conference) specifically asked, about the local church property, "Does each deed contain trust clause (Para. 2503)?" Annual reports for the years 1988, 1989, and 1991 through 1998 were received into evidence. On each such report, the question about the trust clause was answered "Yes." The president of the St. Luke's board of trustees, Vince LaNovara, testified that he did not personally check to see if the trust clauses were on the deeds, but that nevertheless the absence of the trust clauses was brought to his attention by the district superintendent, Rev. Vickie Healy, in June of 2000 after St. Luke's used its real property as security for a line of credit it obtained from a bank in the spring of 2000 for church renovations.[1] In connection with this transaction, a deed was recorded in May of 2000 in which "St. Luke's Methodist Church" granted three parcels of property to "St. Luke's United Methodist Church" to reflect the aforementioned 1973 name change of the local church. But this deed omitted the trust language that had been included in the deeds to the same property when that property had been deeded to "St. Luke's Methodist Church" years earlier. LaNovara testified that the board of trustees "had no intention of that happening" and that the deletion of the trust language was "an oversight" and "a mistake." He further testified that it was his and the board's intention that the trust clauses should remain in, that the trustees reviewed what they were given by the bank and the title company, and that he told the escrow department at the bank that the trust clause needed to be put back into the deed. LaNovara told Healy that the omission of the trust clause was a mistake, that "steps were underway to get it rectified," and that new deeds containing trust clauses were in fact prepared.

A doctrinal dispute arose within the United Methodist Church during 1999 and 2000. Many members of St. Luke's, including its pastor, were on one side in the dispute. Their bishop, Bishop Melvin G. Talbert, was on the other.

---

[1] A district superintendent is appointed by a bishop to assist the bishop. Healy was superintendent of the Fresno District of California-Nevada Annual Conference.

In August of 2000 Bishop Talbert replaced St. Luke's pastor, David Wainscott, with another pastor, Doug Norris. Reverend Healy brought Norris to St. Luke's on August 15, 2000, and introduced him to various people at the church. When Norris returned to St. Luke's the next day, he found that the lock had been changed and his key did not work. After this escalation of the doctrinal dispute, the corrected deeds containing the trust language were never recorded. The deed without the trust language, and a deed of trust, were recorded to secure the line of credit from the bank. Also in response to the doctrinal dispute, St. Luke's United Methodist Church leased the church facilities to a newly incorporated entity called St. Luke's Community Church. The lease was subsequently voided by the two parties after about one month.

## B. *The Start of Litigation*

This litigation began when the California-Nevada Annual Conference of the United Methodist Church (a nonprofit, religious corporation and a regional body of the United Methodist Church, hereinafter the Annual Conference), Bishop Talbert (the bishop responsible for oversight of local churches within the geographical area of the Annual Conference, including St. Luke's), and Reverend Healy (the District Superintendent for the Fresno District of the Annual Conference) sued St. Luke's United Methodist Church (St. Luke's), LaNovara and Reverend Wainscott for breach of a charitable trust. The action sought injunctive relief (which we will shortly describe) and damages. Wainscott was soon thereafter dismissed as a defendant. St. Luke's filed a cross-complaint against the Annual Conference, Bishop Talbert and Reverend Healy. The cross-complaint was a declaratory relief action seeking a declaration that the cross-defendants had no interest in the property, and that St. Luke's could revoke any trust interest which might exist in the real property by recording grant deeds (prepared and attached as exhibits to the cross-complaint) by which St. Luke's would deed the real property to itself, without any trust language.

## C. *Subsequent Events*

While the litigation was pending, and before the trial began, St. Luke's amended its articles of incorporation to state a change in the purposes of the religious corporation. Its purposes became "to establish and maintain a church . . . which . . . shall follow the tenets of Methodism, but which shall not be subject in any manner to the articles, rules, usage, discipline, or

jurisdiction of the United Methodist Church or any organization or other entity which is part of and/or affiliated with the United Methodist Church" and "to acquire, manage, and hold in trust for the sole benefit of this Corporation property of every kind and nature, both real and personal . . . ." In short, St. Luke's would not be affiliated with the United Methodist Church and would hold its property in trust for itself only.

### D. *The Trial Court's Decision*

After the evidentiary phase of the trial, the court received further briefing from the parties before rendering its decision. We should note here, for purposes of clarity, that the parties agreed that the subject of the litigation was the St. Luke's real property, and not any personal property. Also, the three plaintiffs did not contend that St. Luke's had forfeited its interest in the property. Their contention was that, in accordance with the Book of Discipline, real property held by an incorporated local church "shall be held by . . . the corporate body in its corporate name, in trust for the use and benefit of such local church and of the United Methodist Church." The main issues at trial were (1) whether the United Methodist Church had any trust interest in the St. Luke's real property at all (since the St. Luke's articles of incorporation, both in 1948 and as amended in 2000, did not expressly state the existence of such a trust) and (2) if such a trust existed, whether St. Luke's had successfully revoked that trust. The trial court concluded that (1) there was a trust interest in favor of the United Methodist Church, and (2) St. Luke's could not and did not unilaterally revoke that trust. The court found no liability on the part of defendant LaNovara. It awarded injunctive relief in favor of the plaintiffs and against St. Luke's, but no monetary damages. The injunctive relief directed St. Luke's to (1) prepare, execute and record deeds to the St. Luke's property containing trust language in favor of the United Methodist Church, (2) grant access to the St. Luke's property to duly authorized representatives of the United Methodist Church, refrain from interfering with United Methodist ministry and worship at St. Luke's, and refrain from permitting any use of the property by persons not affiliated with the United Methodist Church without the written consent of the Annual Conference, and (3) remove the designation "St. Luke's Community Church" from signage on the property, and to restore the "St. Luke's United Methodist Church" signage on the property. The court further ruled that St. Luke's "shall take nothing by virtue of the Cross-Complaint."

## I.

## THE TRIAL COURT'S FINDING THAT A TRUST INTEREST WAS CREATED IN FAVOR OF THE UNITED METHODIST CHURCH IS SUPPORTED BY SUBSTANTIAL EVIDENCE

We deal here with the events which occurred prior to St. Luke's December 2000 disaffiliation from the United Methodist Church. St. Luke's contends that the plaintiffs made an insufficient evidentiary showing of the existence of a trust in favor of the United Methodist Church. As we shall explain, there was substantial evidence to support the trial court's conclusion that a trust was created in favor of both the general church and the local church.

### A. *The Resolution of Church Property Disputes*

In the leading case of *Protestant Episcopal Church v. Barker* (1981) 115 Cal.App.3d 599 [171 Cal.Rptr. 541] (*Barker*), the court reviewed legal theories which courts had utilized to resolve disputes over church property when religious groups split into different factions and each faction asserted a claim of right to the property. One was the hierarchical theory, utilized in *Watson v. Jones* (1871) 80 U.S. (13 Wa.) 679 [20 L.Ed. 666]. Under the hierarchical theory, civil courts would defer to the authority of ecclesiastical tribunals in disputes over church property. Another theory was the implied trust theory. Under this theory, "church property was the subject of an implied trust in favor of those who adhered to the faith of the founders of the church." (*Presbytery of Riverside v. Community Church of Palm Springs* (1979) 89 Cal.App.3d 910, 928 [152 Cal.Rptr. 854].) The *Presbytery of Riverside* case described but did not utilize this theory, instead noting that a "concomitant of this implied trust doctrine was the necessity for the court to examine in great detail questions of religious doctrine in its determination as to which group of claimed beneficiaries continued to adhere to the 'true' faith and which had departed from the 'true' doctrine. [Citations.]" (*Id.* at pp. 928–929.) A third was the "neutral principles of law" theory explained in *Jones v. Wolf* (1978) 443 U.S. 595 [61 L.Ed.2d 775, 99 S.Ct. 3020]. In *Jones*, the court held that the First Amendment does not require civil courts to defer to a church's own resolution of a property dispute, and instead, "a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute." (*Jones v. Wolf, supra*, 443 U.S. at p. 604.) The First Amendment "prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice" and "requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization," but "[s]ubject to these limitations, . . . the First Amendment does not dictate

that a State must follow a particular method of resolving church property disputes." (*Jones v. Wolf, supra*, 443 U.S. at p. 602.)

The *Jones* court also made it clear that the prohibited considerations of "religious doctrine and practice" do not include church rules on ownership of property. (*Jones v. Wolf, supra*, 443 U.S. at p. 602.) Citing *Maryland & Va. Churches v. Sharpsburg Church* (1970) 396 U.S. 367 [24 L.Ed.2d 582, 90 S.Ct. 499], the *Jones* court stated:

"The neutral-principles approach was approved in *Maryland & Va. Churches, supra*, on appeal from a judgment of the Court of Appeals of Maryland settling a local church property dispute on the basis of the language of the deeds, the terms of the local church charters, the state statutes governing the holding of church property, and the provisions in the constitution of the general church concerning the ownership and control of church property. Finding that this analysis entailed 'no inquiry into religious doctrine,' the Court dismissed the appeal for want of a substantial federal question." (*Jones v. Wolf, supra*, 443 U.S. at pp. 602–603.)

The *Jones* court further observed that "[t]he neutral-principles method, at least as it has evolved in Georgia, requires a civil court to examine certain religious documents, such as a church constitution, for language of trust in favor of the general church." (*Jones v. Wolf, supra*, 443 U.S. at p. 604.)

The *Barker* court concluded that "California has adopted neutral principles of law as the basis for resolution of church disputes." (*Barker, supra*, 115 Cal.App.3d at p. 615.) *Barker* noted that *Presbytery of Riverside v. Community Church of Palm Springs, supra*, 80 Cal.App.3d 910, had reached the same conclusion. The parties here also appear to agree that the neutral principles of law theory is applicable in California, or at least that the hierarchical and implied trust theories do not apply. The *Barker* court added, "Simply put, the issue is whether the local churches expressly hold their property in trust for the benefit of members of [the general church]." (*Barker, supra*, 115 Cal.App.3d at p. 620.) And *Barker* appears to have relied on the above quoted language from *Jones v. Wolf* to state:

"In determining the presence or absence of an express trust in specific church property a court will look at four general sets of facts: (1) the deeds to the property, (2) the articles of incorporation of the local church, (3) the constitution, canons, and rules of the general church, and (4) relevant state statutes, if any, governing possession and disposition of such property. In *Jones v. Wolf*[*, supra*, 443 U.S. at pp. 600, 603], the United States Supreme Court noted approvingly that both the Georgia Supreme Court and the

Maryland Court of Appeals employed these factors to resolve church property disputes." (*Barker, supra,* 115 Cal.App.3d at p. 621, fn. omitted.)

The trial court evaluated each of these four considerations and concluded that a trust interest existed in favor of the United Methodist Church.

### B. *The Standard* of Review

"[N]ormally, the question whether the parties in their dealings have created a trust is one of fact to be determined largely by ascertaining the intent of the parties [citations]. Where . . . the trial court's determination of fact is based on conflicting evidence, or at least evidence giving rise to conflicting inferences, the substantial evidence rule applies, and the trial court's determination will not be disturbed on appeal." (*Presbytery of Riverside, supra,* 89 Cal.App.3d at p. 931.)

St. Luke's contends that the plaintiffs failed to demonstrate by clear and convincing proof that a trust existed in favor of the United Methodist Church. St. Luke's relies on Evidence Code section 662, which states: "The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof." This is really nothing more than an argument that the finding of the existence of a trust was not supported by substantial evidence. " 'The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal.' " (*Nat. Auto. & Cas. Co. v. Ind. Acc. Com.* (1949) 34 Cal.2d 20, 25 [206 P.2d 841]; *Crail v. Blakely* (1973) 8 Cal.3d 744, 750 [106 Cal.Rptr. 187, 505 P.2d 1027]; accord, 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 365.) Here, there was substantial evidence of the existence of a trust.

### C. *Substantial Evidence Supports the Trial Court's Finding of the Creation of a Trust in Favor of the United Methodist Church*

As for the deeds, there was no dispute that five of the nine deeds contained the trust language. The testimony of LaNovara was undisputed that even as late as the spring or summer of 2000, he understood that the Book of Discipline required the trust clause to be on the deeds, and that the St. Luke's board of directors intended and attempted to restore that language. It was not until the doctrinal dispute escalated in August of 2000 with the arrival of Pastor Norris that the board held off on recording corrected deeds and then ultimately (in December 2000) disaffiliated St. Luke's from the United Methodist Church. St. Luke's never contended that the omission of the trust

language from four of the nine deeds was intentional or was any expression of disagreement with the requirement of the Book of Discipline, paragraph 2503, that the trust clauses appear on the deeds.

As for the original articles of incorporation of St. Luke's (i.e., those in effect before the December 2000 amendment to disaffiliate from the United Methodist Church), they did state that a purpose of the corporation was to acquire, manage and hold property "in trust for the benefit of said St. Luke's Methodist Church." The articles did not also expressly say "and also for the benefit of the United Methodist Church." But they did also state that a purpose of the corporation was to establish and maintain a church "as a part of and affiliated with the Methodist Denomination" and "to do all things necessary or convenient to carry out the purpose of said corporation." To be affiliated with the Methodist Denomination, St. Luke's was required to adhere to the "articles, rules, usage and discipline of the Methodist Denomination" (also expressly noted in the articles of incorporation). And it was undisputed that although the Book of Discipline is updated every four years, the Book of Discipline already required trust clauses in property deeds when St. Luke's was incorporated in 1948.

As for the rules of the general church, we have already pointed out that paragraph 2537 of the Book of Discipline required an incorporated local church's real property to be "held by and/or conveyed to the corporate body in its corporate name, in trust for the use and benefit of such local church and of The United Methodist Church" and that "[e]very instrument of conveyance of real estate shall contain the appropriate trust clause as set forth in the *Discipline* (§ 2503)."

As for "relevant state statutes, if any, governing possession and disposition of such property" (*Barker, supra*, 115 Cal.App.3d at p. 621), St. Luke's makes no showing of the existence of any statute that would render erroneous the trial court's conclusion that a trust in favor of both churches was created. St. Luke's calls our attention to the above quoted Evidence Code section 662, and then argues that the evidence of the creation of a trust was not clear and convincing because the trial court did not give sufficient weight to the provision of the St. Luke's articles of incorporation stating that a purpose of the corporation was to hold property "in trust for the benefit of said St. Luke's Methodist Church." St. Luke's candidly acknowledges, however, that those same articles of incorporation also stated that a purpose of the corporation was to maintain a church "affiliated with the Methodist Denomination" and "according to the articles, rules, usage and discipline of the Methodist Denomination." It also acknowledges that even in 1948 the Book of Discipline required trust clauses in favor of both the local church and the general church. St. Luke's could not simultaneously both (a) hold its real

property in trust only for the benefit of itself and (b) hold its real property in trust for the benefit of itself and of the general church. The trial court harmonized the above quoted clauses of the St. Luke's articles of incorporation by concluding that the articles of incorporation themselves did not require St. Luke's to hold property in trust only for the benefit of itself. Thus although St. Luke's correctly points out that the Book of Discipline serves as the functional equivalent of corporate bylaws (see *Metropolitan Philip v. Steiger* (2000) 82 Cal.App.4th 923, 932 [98 Cal.Rptr.2d 605]), and that a bylaw or portion thereof that is in conflict with the articles of incorporation is void (see *Morris v. Richard Clark Missionary Baptist Church* (1947) 78 Cal.App.2d 490, 493 [177 P.2d 811]), St. Luke's did not demonstrate that the Book of Discipline was in conflict with the St. Luke's articles of incorporation.

## II.

## ST. LUKE'S COULD AND DID REVOKE THE TRUST IN FAVOR OF THE UNITED METHODIST CHURCH

The plaintiffs contended, and the trial court agreed, that Corporations Code section 9142 barred St. Luke's from revoking any trust which existed in favor of the United Methodist Church. The trial court relied on subdivisions (c) and (d) of Corporations Code section 9142. These subdivisions state:

"(c) No assets of a religious corporation are or shall be deemed to be impressed with any trust, express or implied, statutory or at common law unless one of the following applies:

"(1) Unless, and only to the extent that, the assets were received by the corporation with an express commitment by resolution of its board of directors to so hold those assets in trust.

"(2) Unless, and only to the extent that, the articles or bylaws of the corporation, or the governing instruments of a superior religious body or general church of which the corporation is a member, so expressly provide.

"(3) Unless, and only to the extent that, the donor expressly imposed a trust, in writing, at the time of the gift or donation.

"(d) Trusts created by paragraph (2) of subdivision (c) may be amended or dissolved by amendment from time to time to the articles, bylaws, or governing instruments creating the trusts. However, nothing in this subdivision shall be construed to permit the amendment of the articles to delete or to

amend provisions required by Section 214.01 of the Revenue and Taxation Code to a greater extent than otherwise allowable by law."

The parties agree that nothing in subdivision (c)(1) or (c)(3) would operate to recognize any trust interest in favor of the United Methodist Church. The plaintiffs contend, however, that under subdivision (c)(2) the Book of Discipline created a trust in favor of the United Methodist Church. This is because the Book of Discipline is a "governing instrument" of the general church. Subdivision (d) provides that a trust created by subdivision (c)(2) "may be amended or dissolved by amendment . . . to the . . . governing instruments creating the trust." The Book of Discipline has not been amended so as to change or delete its paragraph 2537 requirement that the real property of an unincorporated local church be held "in trust for the use and benefit of such local church and of The United Methodist Church." Thus, the plaintiffs say, the trust in favor of the United Methodist Church has not been dissolved.

St. Luke's, on the other hand, argues that nothing in Corporations Code section 9142 was intended to supplant basic principles of trust law, one of which is that "[u]nless a trust is expressly made irrevocable by the trust instrument, the trust is revocable by the settlor." (Prob. Code, § 15400.) As we shall explain, we agree with St. Luke's.

A trust is "a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it." (Rest.2d Trusts, § 2, p. 6.) "A trust is created by a manifestation of intention of the settlor to create a trust, trust property, a lawful trust purpose, and an identifiable beneficiary." (*Chang v. Redding Bank of Commerce* (1994) 29 Cal.App.4th 673, 684 [35 Cal.Rptr.2d 64].) "An express trust is generally created in one of two ways: (1) a *declaration of trust*, by which the owner of property declares that he holds it as trustee for some beneficiary; (2) a *transfer in trust*, by which the owner transfers to another as trustee for some beneficiary, either by *deed* or other transfer *inter vivos*, or by will." (11 Witkin, Summary of Cal. Law (9th ed. 1990) Trusts, § 26(a), p. 911; see also Prob. Code, § 15200; Rest.2d Trusts, § 17.) In the present case, there appears to be no dispute that St. Luke's purchased the properties that are the subject of the present dispute. If the properties were held in trust for the benefit of the United Methodist Church, it is because St. Luke's manifested in a number of different ways its intention to so hold the properties. "Unless a trust is expressly made irrevocable by the trust instrument, the trust is revocable by the settlor. This section applies only where the settlor is domiciled in this state when the trust is created, where the trust instrument is executed in this state, or where the

trust instrument provides that the law of this state governs the trust." (Prob. Code, § 15400.) California's rule that a trust is presumed to be revocable differs from the rule in many other states where trusts are presumed to be irrevocable unless the settlor reserves the right to revoke. (See 18 Cal. Law Revision Com. Rep. (1986) p. 565.) But the presumption of revocability has been the rule in California since 1931 and applies to trusts created since a 1931 amendment to the former Civil Code, section 2280. (See Witkin, *supra*, § 201, p. 1054.)

■ "The person who creates a trust is the settlor." (Rest.2d Trusts, § 3, p. 12.) Because this trust was created by St. Luke's manifested intention to hold the property in trust for the benefit of itself and of the United Methodist Church, we see no conclusion other than that St. Luke's was the settlor, and that St. Luke's could and did revoke the trust when it amended its articles of incorporation in December of 2000 to disaffiliate itself from the "discipline . . . of the United Methodist Church" and to declare that it would hold property "in trust for the sole benefit of this Corporation." (See Prob. Code, § 15401.)

The trial court's decision that the trust was irrevocable rested on its reading of subdivisions (c) and (d) of Corporations Code section 9142. Although the trial court found that a trust existed in favor of the United Methodist Church by considering the *Barker* factors, the court also found that subdivision (c)(2) itself created a trust in favor of the United Methodist Church. It concluded that the Book of Discipline was the "governing instrument" creating the trust. And since that governing instrument had not been amended to eliminate the Book of Discipline's requirement that a local church's property be held in trust for the benefit of both the local church and the United Methodist Church, a trust in favor of the United Methodist Church still existed and could not be revoked by the local church. In other words, the "amendment" referred to in subdivision (d) did not exist and so the trust had not been revoked. Under the trial court's (and the plaintiffs') reading of the statute, only the general church could revoke the trust which existed in its favor. And since the general church had not done so, there was no revocation. We thus turn to the key question in this case: what do subdivisions (c)(2) and (d) of Corporations Code section 9142 mean?

"When construing a statute, we must 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' (*DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387 [20 Cal.Rptr.2d 523, 853 P.2d 978].) The words of the statute are the starting point. 'Words used in a statute . . . should be given the meaning they bear in ordinary use. [Citations.] If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . .' (*Lungren v.*

*Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299] (*Lungren*).) If the language permits more than one reasonable interpretation, however, the court looks 'to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1008 [239 Cal.Rptr. 656, 741 P.2d 154].) After considering these extrinsic aids, we 'must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' (*People v. Jenkins* (1995) 10 Cal.4th 234, 246 [40 Cal.Rptr.2d 903, 893 P.2d 1224].)" (*Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977–978 [90 Cal.Rptr.2d 260, 987 P.2d 727].)

██  The plaintiffs' reading of Corporations Code section 9142, (c)(2) appears to be that this statute enables a general church to create a trust, in favor of itself, with the trust property being the local church's property. In plaintiffs' view, the general church (or "superior religious body") can do this by so providing in the general church's "governing instruments." Such a statute would appear to be sharply at odds with other general principles of trust law. A trust can be created by a "declaration by the owner of property that the owner holds the property as trustee." (Prob. Code, § 15200, subd. (a); see also Rest.2d Trusts, § 17, p. 59.) We know of no principle of trust law stating that a trust can be created by the declaration of a nonowner that the owner holds the property as trustee for the nonowner. A more reasonable reading of the statute is that subdivision (c)(2) was intended to be a codification or recognition of *Barker, supra,* 115 Cal.App.3d 599. This is especially so since subdivisions (c) and (d) were enacted shortly after *Barker* was decided. *Barker* was decided in January of 1981. Subdivisions (c) and (d) of Corporations Code section 9142 were enacted in 1982, and took effect in 1983. (Stats. 1982, ch. 242, § 1, p. 784.) Nothing in *Barker* supports the view that a general church can create a trust in favor of itself simply by enacting a rule stating that a local church holds property in trust in favor of the general church. *Barker* involved four local churches and one general church. The general church adopted a rule (canon 10.06), which declared that on dissolution of a local church its property became distributable to the general church. The court nevertheless concluded that no trust in favor of the general church existed for three of the four local church properties. "At the times the three earlier churches were incorporated and acquired their property, nothing in the general church constitution, canons, and rules operated to create an express trust in local church property in favor of the general church." (*Barker, supra,* 115 Cal.App.3d at p. 624.) These three local churches "did not subject themselves to express restraints on their property by reason of the constitution, canons, and rules of" the

general church. (*Id.* at p. 625.) In contrast to this, the fourth local church "was incorporated subsequent to the adoption of Diocesan Canon 10.06." (*Ibid.*) This fact, plus language in the fourth local church's articles of incorporation, caused the court to conclude that "under neutral principles of law the property of [the fourth local church] was subject to an express trust in favor of" the general church. (*Id.* at p. 625.)

■ The language of subdivision (c) of Corporations Code section 9142 indicates that its purpose was to limit, and not to expand, the circumstances in which the assets of a religious corporation would be "impressed with any trust, express or implied, statutory or at common law." (Corp. Code, § 9142, subd. (c).) This limiting purpose is also apparent from various legislative history materials, such as the "digest" of the Assembly Third Reading of the bill (Sen. Bill No. 1178 (1981–1982 Reg. Sess.), which stated in pertinent part: "The bill's purpose is to limit a religious corporation's property subject to a charitable trust. It requires certain actions to take place in order for a gift of property to be considered a charitable trust." Although the bill appears to have been concerned primarily with assets of a religious corporation which had been donated to that corporation, subdivision (c) of the statute begins with "No assets of a religious corporation" and not with "No donated assets of a religious corporation." Nevertheless, nothing in the statute appears to have been intended to create a new kind of trust which had not previously existed.

*Korean United Presbyterian Church v. Presbytery of the Pacific* (1991) 230 Cal.App.3d 480 [281 Cal.Rptr. 396] describes Corporations Code section 9142 as providing "presumptive rules for religious trusts." (*Korean United Presbyterian Church*, at p. 508.) This language appears to have come from a treatise (Ballantine & Sterling, Cal. Corporation Laws (4th ed. 1962)) in which the authors state: "It is not always entirely clear to what extent the assets of a religious corporation are impressed with a trust beyond a somewhat generalized charitable religious trust for the general purposes of the organization. In an effort to clarify this situation, Corp. Code § 9142 was amended effective January 1, 1983, to provide presumptive rules as to these trusts and to prescribe the circumstances under which they could be amended or modified." (Ballantine & Sterling, *supra*, § 418.01(3)(c), pp. 19-477–19-476 and 19-478 (5/02) (fns. omitted).) Nothing in the statute itself, however, uses the word "presumption" or "presumed."

The Book of Discipline did not, by itself, "create" the trust. The trial court found that the local church's articles of incorporation, and the presence of trust language on five of the nine deeds, demonstrated an intent to be bound by the rules of the Book of Discipline, i.e., an intent to hold the property in

trust for the benefit of both the local church and the United Methodist Church. Thus if the trust in favor of the United Methodist Church was a trust "created by paragraph (2) of subdivision (c)" (Corp. Code, § 9142, subd. (d)), that trust could be amended or dissolved by amending the St. Luke's articles of incorporation to expressly state that St. Luke's would not be "affiliated with" or "subject . . . to the . . . discipline . . . of the United Methodist Church," and that it would hold property "in trust for the sole benefit of this Corporation." That is exactly what St. Luke's did.

We acknowledge that our decision in this case appears to be at odds with the Second Appellate District's recent opinion in *Guardian Angel Polish Nat. Catholic Church of Los Angeles, Inc. v. Grotnik* (2004) 118 Cal.App.4th 919 [13 Cal.Rptr.3d 552]. In *Guardian Angel* the board of directors of the local church "voted . . . to sever all ties with" the general church. (*Id.* at p. 926.) The trial court found that the church property belonged to the local church. The court of appeal reversed. The appellate court relied upon provisions of the general church's constitution to conclude that acts of the local church's board were "unauthorized and consequently a nullity" because the general church's constitution required "diocesan approval of its [the local church's board's] election" and there had been no such diocesan approval. (*Id.* at p. 927.) The appellate court then cited the four *Barker* factors (deeds, articles of incorporation of the local church, rules of the general church, and relevant state statutes, if any), stated that it was applying neutral principles of law, and then concluded that the property belonged to the general church because provisions of the constitution of the general church called for this result. (*Guardian Angel Polish Nat. Catholic Church of Los Angeles, Inc. v. Grotnik, supra*, 118 Cal.App.4th at pp. 930–931.) The *Guardian Angel* court also stated that it was relying on the local church's bylaws calling for this result (*id.* at p. 931), but this was only after the court concluded that the board of directors' repeal of those same bylaws had been ineffectual because the board itself had not been approved by the diocese as required by the general church's constitution. (*Id.* at pp. 926–927.)

A general church may certainly view a local church's board of directors as being "unauthorized" and not in compliance with the general church's rules. This is an ecclesiastical matter, and not a matter with which a civil court would interfere. (*Jones v. Wolf, supra,* 443 U.S. 595.) But we respectfully disagree with the view that acts of a board of directors of a lawfully formed corporation may be viewed by a civil court to be a nullity simply because those acts are deemed unauthorized not by any recognized rule of state law, but rather only by the general church's own rules. In *Barker* the court stated: "Essentially, the hierarchical theory subordinates civil control of church property to ecclesiastical control of church property. Under this theory the canons and rules of a general church override general principles of legal title in the resolution of church controversies over property." (*Barker,*

*supra*, 115 Cal.App.3d at p. 612.) Although the hierarchical theory has supposedly been rejected in California, it will nevertheless live on under the label of "neutral principles of law," if a church's own rules are viewed as trumping state statutes.

## DISPOSITION

The judgment is reversed. Costs on appeal are awarded to appellant.

Gomes, J., and Dawson, J., concurred.

Respondents' petition for review by the Supreme Court was denied December 1, 2004. Baxter, J., did not participate therein. Kennard, J., and Moreno, J., were of the opinion that the petition should be granted.